IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| JOSEPH A. McKOY, | ) Civil Action No. 4:08-2329-CMC-TER |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) **REPORT AND RECOMMENDATION** |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

## JURISDICTION

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a "final decision" of the Commissioner of Social Security, denying plaintiff's claim for Disability Insurance Benefits (DIB). The only issues before the Court are whether the findings of fact are supported by substantial evidence and whether proper legal standards have been applied.

## I. PROCEDURAL HISTORY

The plaintiff, Joseph A. McKoy, filed an application for DIB on July 12, 2005, alleging a disability onset date of January 19, 2004. (Tr. 13, 104). Plaintiff requested a hearing before an administrative law judge (ALJ) after his claim was denied initially and on reconsideration. (Tr. 13, 61-65, 66-70 ). A hearing was held on July 23, 2007, at which plaintiff appeared with counsel, and testified. Plaintiff's mother and a vocational expert also testified at the hearing. (Tr. 26-58). The ALJ issued a decision on October 19, 2007, finding that plaintiff was not disabled because he could perform a limited range of light work. (Tr. 17). As the Appeals Council denied plaintiff's subsequent

request for review of the ALJ's decision (Tr. 4-6), the ALJ's decision became the Commissioner's final decision for purposes of judicial review under 42 U.S.C. § 405(g). <u>See</u> 20 C.F.R. § 404.981.[1]

## II. FACTUAL BACKGROUND

The plaintiff, Joseph A. McKoy, was born May 26, 1970, and was 33 years old on the date of the administrative hearing before the ALJ. (Tr. 20). Plaintiff testified that he completed the eighth grade. Plaintiff has past relevant work experience as a brick mason. (Tr. 20). Plaintiff injured his back in January 2004 when he fell off a ladder at work while using a masonry saw. Plaintiff subsequently underwent treatment with medications, surgeries, and physical therapy, but alleges that his back pain and leg pain have not been relieved, leaving him unable to do any substantial gainful activity.

## III. DISABILITY ANALYSIS

The plaintiff's arguments consist of the following, quoted verbatim:

(1)     The ALJ failed to properly assess the treating and evaluating physician's opinions as required by 20 C.F.R. § 404.1527(d)(1)-(6), SSR 96-2p and SSR 96-5p.

(2)     The ALJ did not consider all of the plaintiff's severe impairments.

(3)     The ALJ erred in failing to evaluate evidence indicating that the plaintiff's lower back impairment meets and/or equals the criteria of Listing 1.04A.

(4)     The ALJ failed to properly evaluate the credibility of the plaintiff.

In his decision of October 19, 2007, the ALJ made the following findings of fact and

---

[1] All references to the Code of Federal Regulations (C.F.R.) are to the 2008 edition.

conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2.  The claimant has not engaged in substantial gainful activity since January 19, 2004, the alleged onset date (20 CFR 404.1520(b) and 404.1571 et seq.).

3.  The claimant has the following severe impairments: status post back surgery and back pain (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work that provides the opportunity to change from a sitting to standing position twice an hour. The claimant is further limited to occasional stair climbing, bending, stooping, crouching, crawling and balancing and is precluded from climbing ladders.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on May 26, 1970 and was 33 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exists in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11.  The claimant has not been under a disability, as defined in the Social Security

Act, from January 19, 2004 through the date of this decision (20 CFR 404.1520(g)).

(Tr. 13-21).

The Commissioner argues that substantial evidence supports the ALJ's decision that plaintiff's subjective complaints of disabling limitations were not fully credible, and that the ALJ adequately explained the basis of his findings as to plaintiff's credibility. The Commissioner asserts that plaintiff's back impairments do not meet Listing 1.04A, and that the ALJ properly determined that plaintiff's depression and migraine headaches are not severe, either. After determining that plaintiff's residual functional capacity (RFC) allowed him to perform a limited range of light work, the ALJ heard testimony from a vocational expert and found that such light work with restrictions was available in the national economy. Specifically, the ALJ found that plaintiff could perform the jobs of unskilled packer, small parts assembler, and parking lot attendant. The Commissioner argues that any deficiency in the ALJ's analysis of the physicians' opinions in determining plaintiff's residual functional capacity was harmless error because, even if plaintiff could not lift more than 10 pounds, as some physicians opined, such limitation to "sedentary work" would not preclude plaintiff's performance of the job of parking lot attendant, which, although characterized as "light work" in the Dictionary of Occupational Titles (DOT), does not typically require lifting of more than a negligible amount of weight, according to its job description in the DOT.

Under the Social Security Act (the Act), 42 U.S.C. § 405 (g), this court's scope of review of the Commissioner's final decision is limited to determining: (1) whether the decision of the Commissioner is supported by substantial evidence, and (2) whether the legal conclusions of the Commissioner are correct under controlling law. Myers v. Califano, 611 F.2d 980, 982-83 (4th Cir.

1988); Richardson v. Califano, 574 F.2d 802 (4th Cir. 1978). "Substantial evidence" is that evidence which a "reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 390. Such evidence is generally equated with the amount of evidence necessary to avoid a directed verdict. Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). The Court's scope of review is specific and narrow. It does not conduct a de novo review of the evidence, and the Commissioner's finding of non-disability is to be upheld, even if the Court disagrees, so long as it is supported by substantial evidence. 42 U.S.C. § 405 (g) (1982); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

The general procedure of a Social Security disability inquiry is well established. Five questions are to be asked sequentially during the course of a disability determination. 20 C.F.R. §§ 404.1520, 1520a.. An ALJ must consider: (1) whether the claimant is engaged in substantial gainful activity, (2) whether the claimant has a severe impairment, (3) whether the claimant has an impairment which equals a condition contained within the Social Security Administration's official listing of impairments (at 20 C.F.R. Pt. 404, Subpart P, App. 1), (4) whether the claimant has an impairment which prevents past relevant work, and (5) whether the claimant's impairments prevent him from any substantial gainful employment.

Under 42 U.S.C. §§ 423 (d)(1)(A) and 423(d)(5), pursuant to the Regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." See 20 C.F.R. § 404.1505(a); Blalock, 483 F.2d at 775.

If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. § 404.1503(a); Hall v. Harris, 658 F.2d 260 (4th Cir. 1981). An ALJ's factual determinations must be upheld if supported by substantial evidence and if proper legal standards were applied. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

A claimant is not disabled within the meaning of the Act if he can return to his past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82-62. The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423 (d)(5). He must make a prima facie showing of disability by showing he was unable to return to his past relevant work. Grant v. Schweiker, 699 F. 2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the national economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. Id. at 191.

## IV. MEDICAL REPORTS

The undersigned has reviewed the medical records and finds many of the reports relevant to the issues in this case. The medical records as set out by the defendant in his brief have not been disputed by the plaintiff. Therefore, the undisputed medical evidence as stated by the defendant is set forth herein.

On January 19, 2004, plaintiff fell off a ladder at work and injured his lower back. A CT scan of his lumbar spine revealed early degenerative spondylosis (arthritis) at the L5-S1 vertebrae with a disc bulge elevating the right S1 nerve root and moderately encroaching on the neural foramina. No nerve root compression was observed. (Tr. 162).

In February 2004, plaintiff presented to spine specialist John A. Welshofer, M.D., with complaints of back pain and leg pain (right greater than left). Plaintiff also reported numbness down his legs. Dr. Welshofer assessed a ruptured disc with S1 radiculopathy, provided a Medrol Dosepak, refilled plaintiff's Ultracet and Flexeril, and scheduled physical therapy. He assessed the following restrictions: "no lift, pull, push or carry greater than 10 pounds, occasional bending, allow position changes as necessary." Dr. Welshofer anticipated that plaintiff would have resolution of his symptoms and be able to return to unrestricted duty in eight to twelve weeks. (Tr. 167).

The following month, a nerve conduction study revealed "mild" lumbosacral radiculopathy. (Tr. 170). Dr. Welshofer observed that plaintiff was "doing better with therapy making some gains." He scheduled plaintiff for a series of epidural steroid injections, and "continue[d] him at sedentary duty," listing the same restrictions as previously noted. (Tr. 168). In April 2004, Dr. Welshofer found plaintiff was "about 50% better in terms of his back pain," but still had a lot of leg pain. He assessed the following restrictions:

> From a work standpoint, position changes as necessary in terms of sitting, standing and walking. No driving for greater than half an hour at a time without a chance to rest for 10 minutes and then get back in and drive 30 more minutes. No more than two hours in any given day of driving. No lift, pull, push, or carry greater than 10 pounds. Occasional bending. No stooping, squatting or kneeling. No ladder climbing.

(Tr. 173).

In June 2004, an MRI of plaintiff's lumbar spine revealed a small broad-based disc extrusion

compressing and displacing the right S1 nerve root. (Tr. 186-87). Plaintiff told Dr. Welshofer that his last epidural injection did not help. Dr. Welshofer noted that plaintiff had radiating symptoms down his right leg with an S1 distribution, and kept plaintiff "at sedentary duty, no lifting, pushing, pulling or carrying greater than 10 pounds, and occasional bending. Position changes as necessary." The next day, Dr. Welshofer's colleague, Robert E. Lins, M.D., noted that plaintiff had "failed conservative treatment" and recommended diskectomy surgery. (Tr. 175).

On July 22, 2004, plaintiff underwent diskectomy surgery. (Tr. 224-25). Eight days later, he reported significant improvement in his leg pain and was "very pleased" with the results. Dr. Welshofer indicated that plaintiff would "return to light-duty work" in four weeks. (Tr. 177).

In September 2004, plaintiff returned to Dr. Lins and reported "excellent relief" of his leg symptoms, and only "occasional back discomfort, much better than he had been prior to surgery." On examination, he had full 5/5 motor strength throughout, improved light touch sensation in a right S1 distribution, and negative (normal) straight leg-raise testing. Dr. Lins indicated that plaintiff's work restrictions were "enumerated on the work restriction form." (Tr. 178).[2] Later that month, however, Dr. Lins noted that plaintiff had developed some worsening back and right leg symptoms, as well as headaches. On examination, he had full 5/5 motor strength throughout, decreased light touch sensation in a right S1 distribution, and "[e]quivocal" straight leg-raise testing. Dr. Lins ordered a lumbar MRI and directed plaintiff to see his family physician about his headaches. (Tr. 179).

In October 2004, an MRI of plaintiff's lumbar spine revealed "mild" epidural and perineural

---

[2]It is not clear what "work restriction form" Dr. Lins was referring to on September 2004. The record contains a "work status form" completed by Dr. Lins in October 2004, but no such form completed prior to that date.

scarring, with no gross evidence of recurrent herniation and "no indication of any nerve root compression focally." (Tr. 188). Dr. Lins noted that plaintiff complained of right leg pain, but had full 5/5 motor strength and negative straight leg-raise testing (Tr. 180). He provided plaintiff with another Medrol Dosepak (Tr. 180), after which plaintiff reported 50% improvement. (Tr. 181). Although he continued to have decreased sensation in the right S1 distribution, plaintiff maintained full motor strength and straight leg-raise tests were negative. (Tr. 181). Dr. Lins noted that plaintiff had "no active signs" of radiculopathy. (Tr. 181). In a Work Status Form, Dr. Lins indicated that, from October 15, 2004, through an unspecified re-evaluation date, plaintiff could lift, carry, push, and pull zero to 10 pounds; occasionally walk, stand, and sit; and never bend, squat, kneel, stoop, twist, reach overhead, or climb. (Tr. 211).

In November 2004, plaintiff returned to Dr. Lins and complained of right leg pain and numbness. He walked with a non-antalgic gait and had decreased lumbar range of motion, decreased sensation in the right S1 distribution, full 5/5 motor strength, and negative straight leg-raise testing. Dr. Lins referred plaintiff to Southeast Pain Care to help treat his residual symptoms. (Tr. 182).

In December 2004, Southeast Pain Care specialist Richard I. Park, M.D., evaluated plaintiff and then wrote a letter to Dr. Lins. (Tr. 230-32). On examination, Dr. Park found plaintiff had limited lumbar range of motion with increased pain on extension and rotation, full 5/5 motor strength in his legs, no weakness, normal reflexes, and no sensory deficits "other than mild diminished sharp and cold sense in the lateral aspect of the right foot." (Tr. 232). Straight leg-raise testing caused back and thigh discomfort at 40 degrees. (Tr. 232). Dr. Park suspected that plaintiff had epidural fibrosis (scarring), rather than permanent nerve root damage. (Tr. 232). In his letter to Dr. Lins, Dr. Park recommended a nerve root block and, if necessary, a spinal endoscopy procedure. (Tr. 230).

In January 2005, Eric A. Schmidt, P.T. (plaintiff's physical therapist at Matrix/Catawba Rehabilitation) noted that plaintiff had a "major flare" of his back and right leg pain when he started a lumbar stabilization program. (Tr. 217).

In February 2005, Dr. Park noted that plaintiff had not benefitted from the nerve root blocks, and scheduled a spinal endoscopy. (Tr. 235). During the endoscopy on March 1, Dr. Park determined that the scarring was "tracking on" the L5 and S1 nerve roots. (Tr. 236). He performed a neuroplasty procedure to remove the scar tissue from the nerve root, and provided an injection, after which plaintiff reported "marked improvement" in his pain. (Tr. 236). In late March, Dr. Park noted that, despite the initial improvement, plaintiff's pain had returned and he had not shown any significant therapeutic response to the neuroplasty procedure. Plaintiff still had pain radiating down his right leg and numbness in the same distribution. Dr. Park adjusted his medication and scheduled a trial spinal cord stimulator placement, which ultimately proved ineffective. (Tr. 238, *see* Tr. 240-42).

In May 2005, plaintiff returned to Dr. Welshofer for a re-evaluation. Dr. Welshofer noted that a trial spinal cord stimulator had failed, and that neither therapy nor medication was relieving plaintiff's pain. Dr. Welshofer recommended a functional capacity evaluation and repeat electrodiagnostic testing to see if there was a chronic nerve injury. He reiterated that plaintiff could "work at the present time with no lift, push, pull, or carry greater than 10 pounds with occasional bending and position changes as necessary." (Tr. 183).

In June 2005, Mr. Schmidt wrote a letter to Dr. Welshofer after performing a functional capacity evaluation, and opined that plaintiff would "qualify for sedentary or light work under the Dictionary of Occupational Titles," as long as he could change positions as needed. (Tr. 218). The accompanying data sheet from the functional capacity evaluation indicated that, for up to 33% of an

eight-hour day, plaintiff could lift and carry 15 to 26 pounds, and push and pull 38 pounds. (Tr. 220).
He also completed a "more-than-30-min[ute]" sitting test and over 50 minutes of standing (Tr. 222),
which translated to a tolerance for sitting 67-100% and standing 67-100% of an eight-hour day. (Tr.
220).

Also that month, Dr. Park noted that plaintiff was experiencing chronic pain and reactive
depression, neither of which was responding to medication. He provided a Duragesic patch. (Tr.
244). In July 2005, plaintiff told Dr. Park that he was "doing better" with the use of the Duragesic
patch and Klonopin, although he still had some moderate daily leg and back pain. (Tr. 245).

In November 2005, state agency physician Richard Weymouth, M.D., reviewed plaintiff's
medical records and determined that he could lift 20 pounds occasionally and 10 pounds frequently;
stand/walk about six hours and sit about six hours in an eight-hour workday; and occasionally climb,
balance, stoop, kneel, crouch, and crawl. (Tr. 250-51). Dr. Weymouth indicated that he had
considered Dr. Welshofer's opinion that plaintiff could only lift 10 pounds, as well Mr. Schmidt's
opinion that plaintiff could perform sedentary or light work, and concluded that the "[o]bjective
evidence indicates [plaintiff] can do light work." (Tr. 255).

In December 2005, Dr. Park noted that plaintiff was "not doing well" and had failed multiple
treatments. Dr. Park noted that plaintiff's "physician rated him fully disabled." On examination,
plaintiff had diminished lumbar range of motion and an antalgic gait. Dr. Park adjusted his
medications. (Tr. 299).

In January 2006, an MRI of plaintiff's lumbar spine revealed post-surgical changes at L5-S1,
with "some enhancing [scar] material surrounding the thecal sac in the right S1 nerve root," but both
L5 nerve roots exited normally and there was no evidence of a recurrent herniation. (Tr. 258). Later

that month, orthopedist Alfred Rhyne, M.D., examined plaintiff and noted that, based on the MRI, there were no signs of the nerve root being swollen (Tr. 259). He suggested a comprehensive rehabilitation program or additional surgery, and questioned plaintiff's ability to return to work, based on his limited education and length of time out of work. (Tr. 259).

In February 2006, Dr. Welshofer noted that the most recent MRI showed "no significant change from what was listed on the October 2004 MRI," and discussed the possibility of surgery. On examination, plaintiff walked with a walking stick, had restricted lumbar range of motion, and had decreased sensation in the L5-S1 dermatome. Subsequently, a spine surgeon determined that plaintiff was not a surgical candidate and instead recommended a comprehensive pain management program at The Rehab Center. (Tr. 270-73).

The same month, plaintiff presented to Kristen Spratt, MSN, FNP, a nurse practitioner for psychiatrist Dino Kanelos, M.D., and reported worsening back pain. (Tr. 306-08). On examination, plaintiff had lumbar spine tenderness, full range of motion in all extremities, positive straight leg-raise testing, and pain with palpation. From a mental standpoint he was anxious, but not depressed. (Tr. 306-08). At follow-up visits in March and April 2006, Nurse Spratt noted that plaintiff was anxious and depressed, but had normal insight, judgment, and speech. Physical findings remained the same. (Tr. 311).

In April 2006, a lumbar discogram showed moderate degenerative fissuring of the L5-S1 disc with a right annular tear, but no frank disc herniation. (Tr. 274, 301).

In May 2006, plaintiff complained to Nurse Spratt of intermittent headaches with vomiting, but the record does not reflect that any change in treatment was made. Physical examination findings remained unchanged. Plaintiff was anxious, but not depressed, and stated he was doing better on

Xanax. (Tr. 316-17). At a follow-up visit at Dr. Kanelos' office in June 2006, straight leg-raise testing was negative. (Tr. 319).

In June 2006, state agency physician James Weston, M.D., reviewed plaintiff's medical records and determined that he could lift 20 pounds occasionally and 10 pounds frequently; stand/walk about six hours and sit about six hours in an eight-hour workday; and occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 279-80).

In July 2006, Crawford Integrated Services medical case manager/nurse Karen Woolf, R.N., completed a "Closure Report" in which she noted that plaintiff had completed a comprehensive rehabilitation program at The Rehab Center. (Tr. 260-61). Ms. Woolf noted that pain specialist Kern Carlton, M.D., had released plaintiff at maximum medical improvement, assessing a 15% whole body impairment rating. (Tr. 260). Ms. Woolf noted that plaintiff would have his medications managed by Dr. Kanelos, and that his medications currently consisted of Lortab for pain control, Xanax for anxiety, Flexeril for muscle spasms, and Imitrex for migraine headaches. (Tr. 260). Ms. Woolf noted that Dr. Carlton had recommended that plaintiff "make every attempt to taper off" Xanax and Lortab, and that plaintiff "probably did not require the use of a cane, although he continued to use one." It was recommended that he taper off the use of assistive devices, and "[s]eek work within [the] physical capabilities outlined in the functional status report." (Tr. 260). Ms. Woolf concluded as follows:

> According to the functional abilities tested at The Rehab Center and the work restrictions assigned by Dr. Kanelos, [plaintiff] is able to sit 60 minutes at a time, and stand 90 minutes dynamically. He is able to walk 40 minutes. He is able to lift 10 pounds frequently; his occasional lifting of more than that weight was not challenged, at the request of Dr. Kanelos. He is able to push and pull 75 pounds over 8 feet. There were no specific recommendations for his positional

> restrictions. . . . [plaintiff] has expressed an interest in commercial
> building inspection or safety management, and was encouraged by the
> rehabilitation team to pursue work within his abilities. (Tr. 261).

The data sheets accompanying Ms. Woolf's report indicated that plaintiff had "10 [pound] lifting restrictions as per Dr. Kanelos." (Tr. 262).

In September 2006, rehabilitation counselor Benson Hecker, Ph.D., saw plaintiff and completed a report at the request of plaintiff's attorney in order to formulate an opinion on plaintiff's vocational status. (Tr. 321-30). Plaintiff told Dr. Hecker that he could sit for up to five minutes, stand up to 10 minutes, walk up to 10 minutes, and lift and carry a gallon of milk and light groceries. (Tr. 327). He reported headaches and depression. (Tr. 327). As to activities, plaintiff said he could drive for short distances, shop, perform light household chores, attend church, and eat in restaurants. (Tr. 327). Dr. Hecker opined that, based on plaintiff's age, education, vocational background, lack of transferable skills, impairments, limitations, and continuing pain, he was "unable to perform any substantial gainful work activity existing in significant numbers in open competition with others." (Tr. 329). He further opined that plaintiff was "extremely limited" in his capacities for sitting, standing, lifting, carrying, turning, twisting, stooping, squatting, reaching, forward bending, and climbing. (Tr. 329). Dr. Hecker opined that plaintiff was unable to effectively meet basic work requirements on a regular and continuing basis. (Tr. 330).

In December 2006, plaintiff sought emergency care after developing suicidal thoughts without intent. (Tr. 333). He described himself as having an "emotional breakdown" and said he had been depressed for three years, particularly over his pending divorce. (Tr. 336). Upon mental status examination, plaintiff had a normal affect, anxious mood, logical thoughts, normal perception, calm and cooperative behavior, full orientation, no memory deficits, and intact judgment. (Tr. 356). He

stated that he wanted to get counseling, received a referral, and was discharged home in satisfactory condition. (Tr. 339-40, 358).

In January 2007, plaintiff reported worsening back pain, but took himself off one of his narcotic pain medications. (Tr. 380-81). Nurse Spratt's examination findings indicated that plaintiff had no lumbar spine tenderness and normal mobility. (Tr. 381). In June 2007, plaintiff again reported back pain (rating it as nine on a scale of one to 10), but denied having any headaches. (Tr. 382).

## V. ADMINISTRATIVE HEARING TESTIMONY

At the July 23, 2007, administrative hearing (Tr. 28-58), plaintiff testified that his legs would "give out," and that he used a cane, which had not been prescribed by a physician. (Tr. 38). He testified that medication helped, but did not eliminate, his depression, and reported problems with memory and concentration. (Tr. 35). He testified that he had migraine headaches once or twice per month, and that Phenergan helped. (Tr. 38). As to his daily activities, plaintiff testified that he could do housework such as vacuuming and mopping for 10 minutes at a time, but had to lie down a lot. (Tr. 30, 40). He testified that he would go out and walk on a short trail to and from a creek twice a day for exercise, and that he was able to drive back and forth to his parents' house (eight miles away) for evening meals. (Tr. 31-32, 43). He testified that, during a typical day, he would listen to the radio, eat breakfast at a nearby restaurant, and lie down "for hours." (Tr. 41-42). Functionally, plaintiff testified that he could sit for 15-20 minutes at a time, stand 15 minutes at a time, walk one-half mile at a time, and lift 10-12 pounds. (Tr. 44-45). He testified that he had difficulty bending and twisting, but could squat without holding onto anything. (Tr. 46-47). He testified that he had not searched for work within the rehabilitation parameters because he feared he would not be able to find work. (Tr.

50).

Plaintiff's mother, Caroline McKoy, testified that during the day plaintiff would "lay around, sit, walk very little, lay around, [and] sit." (Tr. 52). She said she helped him with "a little bit" of laundry and vacuuming. (Tr. 52). She also testified that he was depressed and had memory problems. (Tr. 53).

Vocational expert Katherine Mooney testified that plaintiff's past relevant work as a brick mason was a heavy, highly skilled job. (Tr. 54). The ALJ asked Ms. Mooney about the work capacity of a hypothetical individual of plaintiff's age, education, and background, who could frequently lift 10 pounds, occasionally lift 20 pounds, had an opportunity to sit or stand (changing positions twice an hour), and could occasionally bend, climb stairs, stoop, crouch, crawl, and balance. (Tr. 55). In response, Ms. Mooney testified that the individual could not perform plaintiff's past relevant work, but could perform the light unskilled jobs of packing and filling machine operator (3,000 jobs in the state), small parts assembler (890 jobs in the state), and parking lot attendant (200 jobs in the state). (Tr. 55-56). Ms. Mooney testified that in the cited jobs, employees usually had three breaks per day (one in the morning, one at lunchtime, and one in the afternoon. (Tr. 56).

## VI. PLAINTIFF'S SPECIFIC ARGUMENTS

**Treating and evaluating physicians' opinions.**

Plaintiff argues that the ALJ failed to properly assess the opinions of his treating and evaluating physicians as required by 20 C.F.R. § 404.1527(d)(1)-(6), SSR 96-2p, and SSR 96- 5p. The Social Security Administration's regulations provide that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(d). Generally, more weight is

given to the opinions of examining physicians than non-examining physicians. More weight is given to the opinions of treating physicians since they are more likely to be able to provide a detailed, longitudinal picture of a claimant's medical impairment. See 20 C.F.R. §§ 404.1508 and § 404.1527(d)(2). The medical opinion of a treating physician is entitled to controlling weight, i.e. it must be adopted by the ALJ, if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. See 20 C.F.R. § 404.1527(d)(2), SSR 96-2p, and Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro v. Apfel, 270 F.3d at 178 (citing Hunter v. Sullivan, 993 F.2 31, 35 (4th Cir. 1992).

In determining what weight to give the opinions of medical sources, the ALJ must apply all of the factors in 20 C.F.R. § 404.1527(d)(1)-(6), which are: whether the source examined the claimant; whether the source has a treatment relationship with the claimant and, if so, the length of the relationship and the frequency of examination; the nature and extent of the treatment relationship; the supportability and consistency of the source's opinion with respect to all of the evidence of record; whether the source is a specialist; and, other relevant factors. See SSR 96-2p; Hines v. Barnhart, 453 F.3d 559, 563 (4th Cir. 2006). Furthermore, 20 C.F.R. § 404.1527(d)(2) states: "[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." SSR 96-2p requires that "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion,

supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."

The opinions in question in the instant case are: (1) the opinion of plaintiff's treating physician, Dr. Welshofer, who opined that plaintiff could only perform sedentary work, i.e. "[plaintiff] can work at the present time with no lift, push, pull, or carry greater than 10 pounds with occasional bending and position changes as necessary." This opinion was first expressed in April 2004 and reiterated in May 2005. (Tr. 167-168, 173, 183, 186-187); (2) the opinion of plaintiff's treating physician, Dr. Kanelos (as noted in the record by plaintiff's workers' compensation medical case manager, Ms. Woolf), who opined that plaintiff could only perform sedentary work, i.e. "10 pound lifting restrictions as per Dr. Kanelos." This opinion was first reported in July 2006. (Tr. 260-262); and (3) the opinion of plaintiff's examining vocational consultant, Benson Hecker, Ph.D. who opined in September 2006 that plaintiff "is unable to perform any substantial gainful work activity existing in significant numbers in open competition with others." (Tr. 321-330).

Plaintiff argues that it was clearly erroneous for the ALJ not to provide any reasons at all for rejecting the opinions of Dr. Welshofer and Dr. Kanelos and for excluding their functional restrictions from the plaintiff's RFC. He notes that "judicial review of an administrative decision is impossible without adequate explanation of that decision by the administrator." DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983). Plaintiff also argues that it was inconsistent for the ALJ to use Dr. Welshofer's opinion to refute Dr. Hecker's opinion about plaintiff's functional limitations, but then not to use Dr. Welshofer's opinion in making his own assessment of plaintiff's functional limitations when determining plaintiff's RFC after step three of the sequential evaluation process.

The former use arguably required the ALJ to find that substantial evidence supported Dr. Welshofer's opinion. The latter use arguably required the ALJ to find that substantial evidence did not support Dr. Welshofer's opinion. At a minimum, the ALJ is obliged to provide an explanation as to how he considered and resolved this inconsistency. See Hines v. Barnhart, 453 F.3d 559, 566 (4th Cir. 2006) (stating "[a]n ALJ may not select and discuss only that evidence that favors his ultimate conclusion.").

Plaintiff argues that the ALJ also improperly considered and rejected Dr. Hecker's opinion. Plaintiff acknowledges that the ALJ discounted Dr. Hecker's opinion directly, noting that it was based on only one meeting with plaintiff, that it was inconsistent with both the opinion of Dr. Welshofer "who actually treated the claimant" and with the opinion of plaintiff's rehabilitation therapist (i.e the functional status report submitted by The Rehab Center (Tr. 262)), and that it was "totally inconsistent with the claimant's reported daily activities." (Tr. 20). But, the ALJ did not specifically state what weight Dr. Hecker's opinion was given, thus making his analysis deficient, according to Plaintiff. In addition, plaintiff notes that the ALJ rejected Dr. Hecker's opinion, which was based on a review of plaintiff's complete medical history and an evaluation of the plaintiff prior to the completion of the vocational assessment, but accepted the assessments of two non-examining state agency medical consultants, Dr. Weymouth and Dr. Weston, who did not have all of plaintiff's records to review before forming their opinions. (Tr. 249-256, 278-285). Plaintiff argues that the ALJ's decision to give substantial weight to the opinions of the non-examining state agency consulting physicians violated the regulations and rulings which specify that such opinions are to be accorded less weight than those of treating and examining physicians. See 20 C.F.R. § 404.1527(d)(1) and (f). However, plaintiff fails to note that, under 20 C.F.R. § 404.1527(f)(2)(i), the opinions of the non-examining state agency

medical consultants constitute "opinion evidence" which, although not binding on the ALJ, comes from "highly qualified physicians and psychologists who are experts in Social Security Disability evaluation." Such opinions must be evaluated by the ALJ using the relevant factors in 20 C.F.R. § 404.1527(a)-(e) that are also to be used in evaluating the opinions of other medical sources.

Plaintiff also contends that the ALJ's finding that Dr. Hecker's opinion was "totally inconsistent with the claimant's reported daily activities, which include driving, shopping, performing light chores, attending church and eating in restaurants" (Tr. 20) was based on the ALJ's application of an improper legal standard, i.e. that the ability of the claimant to perform some simple activities of daily living is incompatible with a finding of disability. Plaintiff cites a case from the District of Massachusetts, Waters v. Bowen, 709 F. Supp. 278 (D. Mass. 1989), which includes a long list of cases from several circuits in which courts found claimants disabled despite their ability to perform a variety of activities of daily living (ex: minimal dusting, preparing meals, taking short walks, watching television, driving a car, washing dishes, sweeping). The court acknowledges that the Fourth Circuit, in Totten v. Califano, 624 F.2d 10 (4th Cir. 1980), held that the "continuous period" language of the Act requiring a disability to have lasted or been expected to last for at least a continuous twelve-month period of time "does not require a claimant to show an inability to engage in any substantial gainful activity every day of his existence. An individual does not have to be totally helpless or bedridden in order to be found disabled." Totten, 624 F.2d at 11. However, other Fourth Circuit cases have held that a claimant's daily activities may support a determination that he is not disabled. See Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994)(claimant who performed a wide range of housework was found not disabled) and Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986)(claimant who cooked, washed dishes, took care of house, shopped, walked to town, and was

paid to clean up a poolroom for an hour every day was not disabled).

The Commissioner concedes that the ALJ implicitly rejected the opinion of both doctors that the plaintiff could only lift a maximum of ten pounds and did not directly state why he did so, but argues that this was harmless error. The Commissioner contends the error was harmless because, even if plaintiff should have been found to have only the RFC to perform sedentary work, or restricted sedentary work (with a sit-stand option), he is still capable of performing one of the three restricted light duty jobs cited by the vocational expert, i.e. parking lot attendant, since that job does not actually require lifting more than ten pounds. The Commissioner concedes that the parking lot attendant job (No. 915.473-010, U.S. Dep't of Labor, <u>Dictionary of Occupational Titles</u> (DOT), 4th ed. 1991), is characterized as "light work" in the DOT, and light work may entail exerting up to twenty pounds of force occasionally and/or exerting up to ten pounds of force frequently. But, the Commissioner argues, according to the details of the parking lot attendant job description, the job does not typically require lifting anything except parking tags and parking fees (and possibly cans of oil) and, therefore, appears to be classified as light work based on the level of standing not of lifting.

To accept the Commissioner's attenuated harmless error argument would require the court to find that a job description which the vocational expert testified was classified by the DOT as light unskilled work (Tr. 56), and which the ALJ found was light unskilled work that plaintiff could perform (Tr. 21), is actually sedentary work. That is not the responsibility of the court. "Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990)(citing <u>King v. Califano</u>, 599 F.2d 597, 599 (4th Cir. 1979)("This court does not find facts or try the case de novo when reviewing disability determinations.").

The ALJ's decision does not properly assess the opinions of plaintiff's treating physicians. In discussing his determination of plaintiff's RFC, the ALJ mentioned the opinions of Dr. Welshofer, Dr. Hecker (who is a vocational consultant, not a physician), the non-examining state agency consulting physicians (Drs. Weymouth and Weston), and the opinions expressed in the functional status report prepared by The Rehab Center (as summarized by medical case manager Karen Woolf, RN, which included the opinions of its staff physiatrist, Dr. Carlton, and the lifting restrictions imposed by Dr. Kanelos). But, the ALJ only provided an explanation as to why he discounted Dr. Hecker's opinion. The ALJ used Dr. Welshofer's opinion that plaintiff could perform limited sedentary work to refute Dr. Hecker's opinion that plaintiff was unable to perform any work. However, he did not explain what weight, if any, he gave to Dr. Welshofer's opinion and why he discounted it in making his determinations about the nature and severity of plaintiff's impairments and his RFC. Nor did the ALJ explain what weight, if any, he gave to Dr. Kanelos' opinion, or why he discounted it in making his determinations about the nature and severity of plaintiff's impairments and his RFC. In fact, the ALJ did not specifically discuss or assign weights to any of the medical opinions except those of the non-examining state agency consulting physicians, to which he gave "substantial weight."[3] Because the ALJ otherwise failed to provide any other reasons, it appears that,

---

[3]The ALJ discussed the vocational consultant's opinion as if it were a treating physician's opinion, although Dr. Hecker was not an "acceptable medical source" and his report was not a "medical report" under 20 C.F.R. § 404.1513. However, no regulations or rulings prevented the ALJ from considering Dr. Hecker's vocational opinion as evidence provided by an "other non-medical source" under 20 C.F.R. § 404.1513(d), which the ALJ was *not* obliged to evaluate using the factors in 20 C.F.R. § 404.1527(d)(1)-(6). Rather, the ALJ was specifically authorized to consider Dr. Hecker's vocational expertise, under 20 C.F.R. § 404.1560, in evaluating whether plaintiff could do his past relevant work and, under 20 C.F.R. § 404.1566, in evaluating whether plaintiff's work skills could be used in other work and the specific occupations in which they could be used. It was the ALJ's sole responsibility to assess plaintiff's RFC, under 20 C.F.R. § 404.1546. In doing so, the ALJ was required to consider all of the medical and non-medical

in effect, he adopted the opinions of the non-examining state agency physicians, giving them not just substantial weight but controlling weight, in his determination of plaintiff's RFC, as he stated "The state agency physicians concluded that the claimant would be able to perform light work with postural limitations. The undersigned agrees and finds this consistent with the established residual functional capacity as described above." (Tr. 20). The non-examining state physicians' opinions were consistent with plaintiff's RFC because the ALJ apparently adopted their opinions in determining plaintiff's RFC. However, because the ALJ failed to offer sufficient reasons for doing so, it is not possible for the court to determine that substantial evidence supports the ALJ's RFC determination.

**Consideration of all of plaintiff's impairments.**

Plaintiff argues that the ALJ gave scant attention to his depression and migraine headaches, pointing out that the ALJ's stated reasons for finding that his depression was not severe were as follows:

> I also note that the claimant suffers from depression and headaches. However, I find that these impairments do not impose significant work related limitations. Specifically, much of the medical documentation pertaining to the claimant's depression relates to the dissolution of the claimant's marriage. However, despite the claimant's depression, the claimant is still capable of handling his own daily activities independently. He testified that he watches television, performs some household chores, takes a walk twice a day and spends time with his parents on a daily basis. In addition, the claimant's headaches have been treated successfully with medication. As such, I find that the claimant's depression and headaches are non-severe impairments.

(Tr. 17).

---

evidence, including "descriptions and observations of...limitations...from impairments...provided by...other persons," see 20 C.F.R. § 404.1545, which would, of course, include Dr. Hecker.

Plaintiff contends that medical and other evidence in the record contradicted any implication that his depression was entirely related to his marital problems because he was maintained on anti-depressant and anti-anxiety medication throughout most of the period of time following his disc surgery. With respect to his migraine headaches, Plaintiff contends that, while he received some relief from his medication, he still had migraine headaches once or twice a month that lasted for up to six hours and caused vomiting. Plaintiff also argues that the ALJ failed to properly consider the combined effects of his physical and mental impairments on his residual functional capacity.

The Commissioner argues that it was the plaintiff's burden to show that his impairments or combination of impairments were severe (See Brown v. Yuckert. 482 U.S. 137, 146 note 5 (1987)) and that no physician ever opined that plaintiff had any functional limitations due to his depression or migraines. The Commissioner points out that plaintiff's treatment for both conditions was limited and primarily conservative in nature. Several medical records documented that Xanax and Klonopin alleviated his symptoms (Tr. 245, 316-317) and that, at times, he had no depression. (Tr. 316-317, 359-361, 372). The Commissioner also points out that Dr. Carlton recommended that plaintiff taper off the Xanax and seek work (Tr. 260), and that plaintiff had taken himself off of Oxycontin. (Tr. 380).

"An impairment can be considered as "not severe" only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984). However, the mere presence of a physical disorder is not necessarily disabling; rather, there "must be a showing of related functional loss." Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986). If a symptom can be reasonably controlled by medication or treatment, it is not

disabling. <u>Purdham v. Celebrezze</u>, 349 F.2d 828, 830 (4th Cir. 1965).

There is no medical evidence to support any functional limitation due to his depression or headaches. Also, the medical evidence indicates that his treatment for depression and headaches was conservative and his complaints limited. The one emergency care in December 2006 was an isolated occurrence which appeared to be related to domestic issues. Substantial evidence supports the ALJ's conclusion that plaintiff failed to meet his burden of showing his depression or headaches were a "severe" impairment.

However, <u>Walker v. Bowen</u>, 889 F.2d 47 (4th Cir 1989) states "Congress explicitly requires that the combined effect of all the individual's impairments be considered, without regard to whether any such impairment if considered separately would be sufficiently severe." <u>Walker</u>, 889 F.2d at 49. <u>See</u> 20 C.F.R. § 404.1523.

The ALJ fails to discuss Plaintiff's claims of depression and headaches, albeit not severe alone, in combination with other impairments. Consequently, this issue should be remanded for further explanation to allow this court to determine whether substantial evidence supports the ALJ's decision.

**Analysis of Listing 1.04A criteria.**

In <u>Cook v. Heckler</u>, 783 F.2d 1168 (4th Cir. 1986), the court held that "the ALJ should have identified the relevant listed impairments. He should then have compared each of the listed criteria to the evidence of [the claimant's] symptoms. Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination." <u>Cook</u>, 783 F.2d at 1173.

Plaintiff argues that, at the third step of the evaluation process, the ALJ erred by failing to

properly consider the evidence that plaintiff's back impairment met the criteria of Listing 1.04A in

20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ's only finding with respect to this issue was:

> The undersigned has considered Sections 1.00 of Listing of Impairments. However, I find that there is no evidence of the claimant's inability to ambulate effectively. Examples of "inability to effectively ambulate" include but are not limited to: inability to walk without the use of a walker, two crutches or two canes, inability to use standard public transportation, inability to climb a few steps at a reasonable pace, the inability to carry out routine ambulatory activities such as shopping and banking and the inability to travel without a companion. Specifically, the claimant was instructed to taper his use of an assistive device as it was felt that the device was not a necessity. Therefore, the claimant does not satisfy the requirements of this Listing.

(Tr. 17)

Plaintiff asserts that the ALJ's finding was clearly erroneous because "Listing 1.04A does not include

any requirement that the Plaintiff demonstrate that he is unable to ambulate effectively. Therefore,

the ALJ's entire rationale for finding that the Plaintiff does not meet a listing is not supported by

substantial evidence." (Pl. B. 32).

Plaintiff's is mistaken that there is no requirement that the claimant prove his inability to

ambulate effectively in order to meet the criteria of the severe musculoskeletal system impairments

contained in Listings 1.00 - 1.08. The provisions of 20 C.F.R. § 404.1525 explain how the SSA uses

the Listings:

> (c) *How do we use the listings?*
>
> (1) Each body system section in parts A and B of appendix 1 is in two parts: an introduction, followed by the specific listings.
> (2) The introduction to each body system contains information relevant to the use of the listings in that body system; for example, examples of common impairments in the body system and definitions used in the listings for that body system. We may also include specific criteria for establishing a diagnosis, confirming the existence of an impairment, or establishing that your impairment(s) satisfies the criteria of a particular listing in the body system. Even if we do not include specific criteria for establishing a diagnosis or confirming the existence of your impairment, you must still show that you have a severe medically

> determinable impairment(s), as defined in §§ 404.1508 and 404.1520(c).
>
> (3) The specific listings follow the introduction in each body system, after the heading, *Category of Impairments*. Within each listing, we specify the objective medical and other findings needed to satisfy the criteria of that listing. We will find that your impairment(s) meets the requirements of a listing when it satisfies all of the criteria of that listing, ***including any relevant criteria in the introduction***, and meets the duration requirement (see § 404.1509)

20 C.F.R. § 404.1525(c) (emphasis added).

Although ineffective ambulation is not specifically mentioned in Listing 1.04 "Disorders of the spine," it is a critical factor to be considered under all of the Musculoskeletal System Listings in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00 et seq. because it is included in the relevant criteria in the introduction. Indeed, under 1.00B.2. "How we define loss of function in these listings," the regulations state:

> [r]egardless of the cause(s) of a musculoskeletal impairment, functional loss for purposes of these listings is defined as the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment .. . [which] must have lasted, or be expected to last, for at least 12 months.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00 B2.a.

Thus, it was not error for the ALJ to consider plaintiff's ability to ambulate effectively, as a threshold criterion, in determining whether plaintiff's impairment met the requirements of Listing 1.04A.

The ALJ cited the examples of "ineffective ambulation" set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00B.2.b.(2) and noted that plaintiff used only one cane, and that a physical therapist had recommended he discontinue using it. At the hearing, plaintiff testified that he walked for exercise on a quarter-mile trail between his house and a creek twice a day, for approximately 30 minutes (Tr. 31) and that he could walk half a mile continuously at one stretch

without stopping. (Tr. 45). He testified that he was able to drive back and forth to his parents' house. (Tr. 32). He testified that he used a [single] cane, although it was not given to him by the doctor, to relieve the pressure on his right leg when he walked. (Tr. 38). Other evidence in the record concerning plaintiff's medical treatment, physical therapy, and activities of daily living substantiated that his ability to ambulate, although impaired by his back and leg pain, did not meet the definition of "ineffective ambulation" under 20 C.F.R. Part 404, Subpart p, Appendix 1, § 1.00B.2.b.(1), i.e. "having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities."

The ALJ applied the correct legal standard at step three. Substantial evidence supports the ALJ's finding that Plaintiff's impairment and resulting ambulatory limitations did not meet the "loss of function" requirement under the introduction to the Listing, because they did not result in an extreme limitation of plaintiff's ability to walk. Having determined that "the claimant does not satisfy the requirements of this Listing" (Tr. 17), the ALJ was not required to proceed through a further comparison of plaintiff's impairments with the specific impairments in the Listing.

## VII. CONCLUSION

Accordingly, pursuant to the power of the Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of Section 205(g) of the Social Security Act, 42 U.S.C. § 495(g), it is,

RECOMMENDED that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further administrative

action as set out above.

Respectfully submitted,


s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

August 17, 2009
Florence, South Carolina